# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**MAJOR MOTEN,**

                     **Plaintiff,**

**-vs-**                                   **Case No.  6:06-cv-143-Orl-28JGG**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL**
**SECURITY,**

                     **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

Plaintiff Major Moten ["Moten"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for disability and supplemental security income benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision should be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

On October 10, 2002, Moten filed a claim for disability insurance benefits and supplemental security income benefits.  Moten claimed disability as of April 1, 2002 due to diabetes mellitus, neuropathy, and the side effects of his medications (including inability to drive and perform hazardous tasks, and the need to avoid direct exposure to sunlight).  R. 49, 57, 197.  His claim was denied initially, and upon reconsideration.  R. 31, 34, 190.  On July 8, 2004, the Honorable Philemina M. Jones, Administrative Law Judge ["ALJ"], held a forty-five-minute hearing on Moten's claim in

Daytona Beach, Florida.  R. 201 - 31.  Moten appeared without an attorney, and represented himself at the hearing.  R. 204.  The ALJ heard testimony from Moten and Joseph Agruso, an impartial vocational expert ["VE"].

On July 12, 2005, the ALJ issued a decision that Moten was not disabled and not entitled to benefits.  R. 13 - 20.  Following a review of the medical and other record evidence, the ALJ found that Moten could not perform his past relevant work as a sanitation worker.  R. 14, 17, 19, Finding 8.  The ALJ found that Moten nevertheless retained the residual functional capacity ["RFC"] to perform the full range of the physical exertional requirements of light work, except that Moten could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds.  R. 19, Finding 7.  In addition, the ALJ found that Moten had to avoid concentrated exposure to extreme cold and hazards (such as machinery and heights), and that Moten could not read or write.  *Id.*  Considering the testimony from the VE and using the Medical-Vocational Guidelines as a "framework" for decision making, the ALJ concluded that Moten was not disabled.[1]  R. 19, Finding 12, 13.

On December 2, 2005, the Appeals Council denied review.  R. 5.  On July 25, 2006, Moten timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 at 1.  On July 25, 2006, Moten filed in this Court a memorandum of law in support of his appeal.  Docket No. 10.  On September 22, 2006, the Commissioner filed a memorandum in support of her decision that Moten was not disabled.  Docket No. 12.  The appeal is ripe for determination.

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court.  According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation.  Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year  —  an average of about one per week.

## II.   THE PARTIES' POSITIONS

Moten argues that the Commissioner's decision was not based on substantial evidence. Docket No. 10 at 1. He assigns three specific errors to the Commissioner. First, Moten claims that the Commissioner erred by failing to meet her burden to establish that Moten could perform other work that exists in the national economy. *Id.* at 5 - 7. More specifically, Moten argues that the ALJ failed to accurately describe Moten's limitations in questions posed to the VE. *Id.* Second, Moten claims that the Commissioner erred by failing to give substantial weight to the opinion of Dr. John Ortolani, Moten's treating physician. *Id.* at 7 - 8. Third, Moten claims that the Commissioner erred in by improperly discrediting Moten's testimony on his pain. *Id.* at 8 - 9.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that she met her burden to establish that Moten could perform other work by eliciting and relying on the testimony of the VE. Docket No. 12-1 at 12 - 13.[2] More specifically, the Commissioner argues that the ALJ accurately described Moten's limitations in the questions she posed to the VE. *Id.* Second, the Commissioner argues that the ALJ properly considered and properly evaluated all of the medical evidence, including the reports and notes by the treating physician, Dr. Ortolani. *Id.* at 3 - 5. Third, the Commissioner argues that the ALJ considered and correctly evaluated Moten's testimony and subjective complaints of pain. *Id.* at 7 - 12.

---

[2]In her memorandum, the Commissioner discusses Moten's three arguments in a different order from Moten. To minimize confusion, the undersigned addresses the issues in the same order as presented in Moten's memorandum.

III.   **THE STANDARD OF REVIEW**

A.   **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

B.   **REVERSAL**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a

-4-

Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).  A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.     REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences.  *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir.

-5-

1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon*

*v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[3] *Id.*

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

---

[3]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

### A.    DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right. *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

### B.    THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she

is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether

a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

## C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational

opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a

wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner.  20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.  *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

-13-

### E.   PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.   42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.   CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not

disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## G.     MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may

be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

## V.     APPLICATION AND ANALYSIS

### A.     THE FACTS

Moten was born on April 21, 1953, and was fifty-two years old on the date the ALJ issued her decision to deny benefits.  R. 20, 193, 215.  Moten completed ninth grade, and has past work experience as a sanitation driver and helper and a night mechanic.  R. 83.  Moten worked from 1969 through April 2002.  R. 47.  Moten claims disability as of April 1, 2002 due to diabetes mellitus, neuropathy, and the side effects of his medications, including inability to drive, perform hazardous tasks, and the need to avoid direct exposure to sunlight.  R. 49, 57, 197.

Moten submitted treatment from K.E. Khan, M.D., covering the period from May 1994 through June 2, 2002.  R. 132 - 50.  The notes are handwritten and mostly illegible.  The legible portions reveal that between May 1994 and October 1997, Moten visited Dr. Khan approximately eight times with various complaints of coughing, body aches (mostly in his back, chest, and arms), headaches, and right side pain.  R. 147 - 50.  Dr. Khan treated Moten with pain medication, including Daypro (a nonsteroidal, anti-inflammatory drug for pain).  *Id.*

On April 19, 1999, Moten visited Charles B. Williamson, M.D., and complained of headaches and discomfort in his head and neck.  R. 111.  Dr. Williamson assessed osteoarthritis of the cervical spine, and recommended Daypro.  *Id.*  Moten returned to Dr. Williamson on May 17, 1999.  *Id.*  Moten continued to complain of discomfort, but reported some improvement in his pain.  *Id.*  Dr. Williamson recommended that Moten continue his treatment with Dr. Khan.  *Id.*

-16-

Moten sought treatment with Dr. Khan for pain and headaches approximately five times between May 1999 and October 1999.  R. 144 - 47.  Dr. Khan assessed hypertension, myalgia, headaches, and obesity, R. 146, and continued to treat Moten with medication, R. 144 - 47.

Moten returned to Dr. Khan on January 26, 2000 with complaints of pain in his knees.  R. 144.  Dr. Khan assessed arthritis of the knees.  *Id.* On February 9, 2000, Moten told Dr. Khan that his knees felt better when he took Vioxx.  R. 143.  Moten, however, continued to complain of pain in his right shoulder, neck, and knees on April 21, 2000.  *Id.*  On May 11, 2000, he reported pain in the right flank.  R. 142.  Dr. Khan continued to assess myalgia, and recommended medication and application of heat.  R. 142 - 44.

On July 25, 2000, Moten went to Dean & Miller, M.D., P.A., and complained of having red and scratchy eyes after getting sand in his eyes.  R. 121.  The doctor diagnosed bacterial conjunctivitis, and prescribed medication.  *Id.*

On August 10, 2000, Moten returned to Dr. Khan with complaints of pain in the neck, knees, hips, ankles and knees.  R. 140.  Dr. Khan assessed "questionable" fibromyalgia.  *Id.*  On August 29, 2000, he reported experiencing pain in his upper back and neck and tingling in his fingers.  *Id.*

On September 5, 2000, Moten returned to Dean & Miller, M.D., P.A., and complained of dryness and redness in the eyes.  R. 120.  The doctor's impression was a cataract (that was probably alcohol-related), suspected glaucoma, and probable bacterial conjunctivitis.  *Id.*  On September 26, 2000, Moten stated that his eyes were "a little better, but still irritated."  R. 117.  The doctor's impression was suspected glaucoma, although the doctor also noted that Moten had normal optic

-17-

nerves and no family history of glaucoma.  *Id.*  The doctor recommended over-the-counter lubricant, and "no treatment at present."  *Id.*  Moten was to return in six months.  *Id.*

Upon referral from Dr. Khan, Moten visited Michael D. Kohen, M.D., on September 11, 2000. R. 112 - 13.  Moten told the doctor that he had been experiencing increasing pain for the previous four to five months.  R. 113.  Moten also reported past surgeries on his knee, ankle, and right arm.  *Id.*  Dr. Kohen performed a physical examination which revealed non-tender spine and joints and "good strength."  *Id.*  Dr. Kohen's impression was Reiter's syndrome[4] and infectious asthma.  R. 112.  The doctor recommended Septra for the infection, a bone scan and blood evaluation, and told Moten to stop smoking.  *Id.*  The doctor also told Moten to return for follow-up appointment in four weeks, and noted that Moten's pulmonary function study showed normal results.  *Id.*

On March 5, 2001, Moten returned for a follow-up examination of his eyes at  Dean & Miller M.D., P.A.  R. 116.  The doctor's physical examination was normal, and the impression was normal. *Id.*  The doctor noted that Moten was "stable," and recommended that Moten use over the counter eye drops.  *Id.*

Moten returned to Dr. Kohen on March 28, 2001.  R. 114.  Moten complained of experiencing "a lot of pain" in the neck and across the posterior shoulders and low back.  *Id.*  Dr. Kohen noted that Moten's gait was intact; his spine and joints were not tender; and that he had a full range of motion and good strength.  *Id.*  The impression was Reiter's syndrome.  *Id.*

---

[4] Reiter's syndrome is the association of problems with the urethra, eyes, skin lesions, and arthritis (and sometimes diarrhea).  STEADMAN'S MEDICAL DICTIONARY 1739 (26th ed. 1995).  Most of these conditions may recur at monthly or yearly intervals, but the arthritis is generally persistent.  *Id.*

-18-

On July 25, 2001, Moten saw Dr. Khan for complaints of tingling "all over" his right arm.  R. 138.  Moten continued to complain of pain in his knee and arm.  The doctor's impression was questionable Reiter's syndrome and neuropathy.  *Id.*

On August 30, 2001, John Ortolani, M.D. (upon referral from Dr. Khan) evaluated Moten for pain in his feet and right arm.  R. 128.  Moten reported that the pain in his right arm radiated down into the last four digits of his hand.  *Id.*  Dr. Ortolani's physical examination was mostly normal with some tenderness and irritation in the feet.  *Id.*  Dr. Ortolani's impression was peripheral neuropathy, although he also stated that Moten's right arm problems might stem from a separate problem.  *Id.*  Dr. Ortolani ordered EMG and nerve conduction studies, and prescribed Vioxx, Neurontin, and vitamins.  *Id.*  Dr. Ortolani performed the EMG and nerve conduction studies on September 11, 2001.  R. 129.  The study of the right upper extremity showed normal results.  *Id.*  The study of his legs showed distal changes in both legs, which Dr. Ortolani observed "may be consistent with a mild early peripheral neuropathy."  *Id.*  Dr. Ortolani also stated that he could not rule out lumbar radiculopathy.  *Id.*

On October 9, 2001, Moten returned to Dr. Ortolani who explained that the EMG and nerve conduction study results were consistent with "mild neuropathy."  R. 127.  Dr. Ortolani stated that the pain in Moten's right arm might be due to diabetes, so he prescribed Doxepin.  *Id.*  Dr. Ortolani scheduled a follow-up evaluation for the following month.  *Id.*

Dr. Ortolani saw Moten again on November 13, 2001, and noted that Moten seemed to be "doing better at this time."  R. 126.  Moten reported that the pain had decreased in his feet, and that he felt less sore.  *Id.*  Dr. Ortolani increased Moten's dosage of Doxepin.  *Id.*  On December 13, 2001,

Dr. Ortolani stated that Moten seemed to be "doing reasonably well with his neuropathy with the Doxepin." R. 125.

On March 14, 2002, Moten visited Dr. Ortolani who, again, observed that Moten seemed "to be doing better." R. 124.  Moten's dizziness was mostly resolved, and Dr. Ortolani's notes indicate that the medication helped control the burning and irritating pain related to Moten's peripheral neuropathy.  *Id.*

Moten claims disability as of April 1, 2002, near the time he lost his job and stopped working. R. 49, 226.  On May 7, 2002, Moten visited Dean & Miller, M.D., for a follow-up appointment.  R. 115 - 16.  The doctor's impression was diabetes mellitus and mild cataracts.  R. 115.  The doctor again noted that Moten was "stable."  *Id.*

On June 17, 2002, Moten returned for a follow-up appointment with Dr. Ortolani.  R. 123. Moten told the doctor that he was still "getting tired a lot, but it does not seem to be the Doxepin . . ."  *Id.*  Moten also stated that the Doxepin was helping the pain in his feet.  *Id.*  The doctor recommended vitamins, and instructed Moten on his diet.  *Id.*  On August 19, 2002, Dr. Ortolani saw Moten again, and noted that Moten was doing well as a result of the prescribed diet and Doxepin.  R. 122.  Moten's pain seemed to be "under reasonable control."  *Id.*  Moten also reported that his feet were starting to feel better, and that he was walking more.  *Id.*  Dr. Ortolani "discharge[d]" Moten back to Dr. Khan, his primary care physician.  *Id.*

On December 6, 2002, a non-examining state agency physician assessed Moten's physical RFC.  R. 151 - 58.  The physician opined that Moten could lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for approximately six hours in an eight-hour workday;

and push and pull without limitation.  R. 152.  Moten could occasionally climb and frequently balance, stoop, kneel, crouch, and crawl.  R. 153.  Moten had some environmental limitations (such as avoiding concentrated exposure to extreme heat and hazards), and had no manipulative, visual, or communicative limitations.  R. 154 - 55.

Moten was admitted to the Bert Fish Medical Center emergency room on December 10, 2002. R. 159 - 60.  Moten complained of experiencing ongoing right knee pain.  *Id.*  A physical examination showed that the right knee had normal range of motion and was normal weight-bearing.  R. 166.  The doctor treated Moten with Vioxx, and recommended that Moten rest for two days, apply heat to the knee, and follow-up with his primary care physician.  R. 161, 166 - 67.

On March 5, 2003, a second non-examining state agency physician assessed Moten's physical RFC.  R. 168 - 75.  The physician opined that Moten could lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for six hours in an eight-hour workday; and push and pull without limitation.  R. 169.  Moten could occasionally climb and frequently balance, stoop, kneel, crouch, and crawl.  R. 170.  Moten had no manipulative, visual, or communicative limitations, but he had to avoid concentrated exposure to hazards.  R. 171 - 72.

Moten returned to Dr. Ortolani on June 28, 2004.  R. 178.  In his notes, Dr. Ortolani stated that Moten:

> seems to be doing reasonably well at this time.  He still has aches and pain in his neck and back.  He is still relatively disabled.  He has the neuropathy and this affects him and he cannot do very much.  He uses the Lortab occasionally, whenever he tries to do something, as this causes a lot of pain for him . . . . During the summer he is going to try to take some time off from the medicines, and I have asked him to do that.

R. 178.  Dr. Ortolani refilled Moten's Doxepin prescription.  *Id.*

-21-

Moten testified at the hearing before the ALJ on July 8, 2004.  R. 203- 31.  He testified that he was not taking his pain medication because it caused him to "throw" his muscles.  R. 212 - 13.  He stated the he is able to drive, and that he drove himself to the hearing.  R. 216.  Moten estimated that he could walk slowly for fifteen to twenty minutes before he had to stop because of the pain; stand for two to three hours; lift forty to fifty pounds; and sit for a half an hour to an hour.  R. 221 -22.  Moten further testified that he was able to bathe and dress himself, and do his own laundry.  R. 223 - 24.  Moten testified that he did not have enough money to see doctors other than his own two doctors.  R. 214.  He also mentioned that he saw Dr. Milton for his diabetes medication prescription.  *Id.*  Moten further stated that he was "laid off" in April 2002; that he had been looking for work since then; but that he could not get work after telling prospective employers about his diabetes.  R. 226.  The ALJ also heard testimony from a VE who testified that a person with Moten's limitations (as described by the ALJ) could perform work as a bench assembler, electrical sub assembler, and a wire worker.  R. 229 - 30.

On September 20, 2004,[5] Moten returned to Dr. Ortolani.  R. 177.  Dr. Ortolani noted that:

> [t]here is nothing more I can do for the patient at this time.  He has a neuropathy related to diabetes.  As long as he takes the Doxepin, Naprosyn, and an occasional Lortab for pain, he seems to do reasonably well.  At this time I see no reason to continue to see him  . . .   I am going to discharge him to his primary care physician and follow him only on an as needed basis.

*Id.*  Dr. Ortolani gave Moten a refill of his prescriptions for six months.  *Id.*

---

[5]Subsequent to the hearing but prior to the date of the ALJ's decision to deny benefits, Moten visited Dr. Ortolani and underwent a consultative evaluation.  The ALJ procured the additional evidence, and entered the records as evidence prior to issuing her decision to deny benefits.  R. 21 - 22.

On February 17, 2005, Roberto Mixco, M.D., completed a neurological evaluation at the request of the Office of Disability Determinations.  R. 180 - 82.  Moten's chief complaint was diffuse pain in his neck, shoulders, low back. elbows, knees and feet.  R. 180.  Moten stated that he had been experiencing neck and back pain for four or five years, and described his neck pain as sharp with radiation to both shoulders.  *Id.*  Moten's gait was antalgic, but otherwise, a physical examination revealed mostly normal results.  R. 181.  Muscle strength was 5/5 in all four extremities, and muscle tone, extremity movement, and hand grip were all normal.  *Id.*  The doctor's impression was a history of chronic pain and a history of peripheral neuropathy that was not clinically significant.  *Id.*  Dr. Mixco opined that Moten could "perform work-related activities such as carrying, handling objects, hearing speaking [sic] and traveling without restriction."  R. 182.  Dr. Mixco also stated that Moten could perform "work-related mental activities," and concluded that "Moten is not totally disabled and should be able to maintain some form of gainful employment that is compliant with his restrictions." *Id.*

Dr. Mixco also completed a Medical Source Statement questionnaire.  R. 183.  Dr. Mixco opined that Moten could lift and carry fifty pounds occasionally and twenty-five pounds frequently and stand and walk for less than two hours in an eight-hour workday.  *Id.*  He stated that Moten needed to periodically alternate between sitting and standing to relieve his pain, and that Moten could frequently climb ramps and stairs, balance, kneel, crouch, and crawl and occasionally stoop and climb ladders.  R. 184.  Dr. Mixco opined that Moten's impairments did not affect his ability to push or pull, but also stated that Moten was limited in his upper and lower extremities.  *Id.*  Moten had no

manipulative limitations; had visual limitations in that he had to wear glasses; and was limited with respect to hazards such as machinery and heights.  R. 185 - 86.

**B.      THE ANALYSIS**

1.      The Hypothetical Question Posed to the Vocational Expert

First, Moten claims that the Commissioner erred by failing to meet her burden to establish that Moten could perform other work that exists in the national economy.  Docket No. 10 at 5 - 7.  Moten argues that the ALJ failed to accurately describe Moten's limitations in his questions to the VE.  *Id.* More specifically, Moten claims that the ALJ failed to state that Moten could stand and walk for less than two hours in an eight-hour workday, and that Moten had to alternate between sitting and standing (as articulated by Dr. Mixco).  *Id.* at 6.  The Commissioner counters that the ALJ properly accorded little weight to Dr. Mixco's opinions in his Medical Source Statement as they were inconsistent with his own examination records.  Docket No. 12-1 at 6.  The Commissioner is correct.

During the hearing, the ALJ asked the VE a series of hypothetical questions that assumed work restrictions similar to Moten's impairments.  The ALJ asked the VE to assume an individual of Moten's age and education and work background, and to further assume:

> that the individual could lift 20 pounds occasionally, 10 pounds frequently.  Sit, stand or walk for six hour [sic] in an eight hour day.  Can occasionally climb ramps, stairs, ladders, ropes and scaffolds.  And . . . the individual is to avoid concentrated exposure to extreme cold, [sic] and hazards.

R. 227 - 28.  The ALJ asked the VE whether the hypothetical individual would be able to perform any of Moten's past relevant work or any other work.  R. 228.  The VE stated that the individual would not be able to perform Moten's past relevant work, but that he would be able to perform work as a bench assembler, a light duty, unskilled job.  R. 228 - 29.  Next, the ALJ asked the VE whether he

-24-

would change his answer if the person were unable to read or write.  R. 229 - 30.  The VE responded that the person would still be able to perform the bench assembler position, and that the person would also be able to perform work as an electrical sub assembler and a wire worker (both of which involve light duty, unskilled work).  R. 230.

Following a review of the medical evidence, the ALJ found that Moten retained the RFC to perform the full range of the physical exertional requirements of light work, except that Moten could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds.  R. 19, Finding 7.  In addition, the ALJ found that Moten had to avoid concentrated exposure to extreme cold and hazards (such as machinery and heights), and that Moten could not read or write.  *Id.*  Considering the testimony from the VE and using the Medical-Vocational Guidelines as a "framework," the ALJ concluded that Moten was not disabled.  R. 19, Findings 12, 13.

In reviewing the medical evidence, the ALJ considered and properly rejected the opinions expressed in Dr. Mixco's Medical Source Statement.  R. 17.  More specifically, the ALJ correctly noted that the opinions in the doctor's Medical Source Statement were inconsistent with his own notes from his consultative examination.  *Id.*  In fact, Dr. Mixco's expresses inconsistent opinions within his Medical Source Statement.  For instance, Dr. Mixco's examination notes indicate that Moten's extremities were mainly normal, and that he had 5/5 muscle strength.  R. 181.  In his Medical Source Statement, Dr. Mixco noted that Moten was *not* limited in his ability to push and pull, but also stated (without further explanation or describing the "nature and degree" as instructed by the questionnaire) that Moten was limited in his upper and lower extremities.  R. 184.  Further, despite his opinion that Moten had upper and lower extremity limitations, Dr. Mixco also opined that Moten could lift *more*

-25-

weight than described by the non-examining state agency physicians (R. 152, 169), the ALJ in her hypothetical (R. 227 - 28), and the ALJ in her finding of Moten's RFC (R. 19, Finding 7).

In addition, the other medical evidence supports the ALJ's hypothetical question and her RFC. All of Moten's treating physicians treated Moten *very* conservatively by prescribing medication and recommending application of heat to alleviate the pain.   None of these physicians recommended that Moten limit his walking or alternate between sitting and standing.   In fact, none of the treating physicians placed any restrictions on Moten's ability to work.   The ALJ, thus, properly rejected the opinions of Dr. Mixco, a consultative examiner (*not* a treating physician).   Substantial evidence supports the ALJ's hypothetical.

### 2.    The Opinion of Treating Physician. Dr. John Ortolani

Second, Moten claims that the Commissioner erred by failing to give substantial weight to the opinion of Dr. John Ortolani, Moten's treating physician.  Docket No. 10 at 7 - 8.  Moten argues that the ALJ failed to mention Dr. Ortolani's opinion that Moten was "still relatively disabled" on June 28, 2004, and therefore failed to articulate good cause for rejecting this opinion.  *Id.*  The Commissioner, does not explicitly concede harmless error, but argues that Dr. Ortolani's "one-time statement" is insufficient to support a finding that Moten was disabled.  Docket No. 12-1 at 4.

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).  In his June 28, 2004 notes, Dr. Ortolani did state that Moten "is still relatively disabled." R. 178.  Dr. Ortolano, however, did not specify what he meant by "relatively

disabled." It is not clear from his notes whether Dr. Ortolani was expressing his own opinion, or recounting Moten's own subjective statement. *See id.* In his notes from the same visit, Dr. Ortolani indicates that Moten was "doing reasonably well," and recommended that Moten wean himself off of the medications during the summer. *Id.*

Each time he saw Moten, Dr. Ortolani, like Moten's other physicians, recommended conservative treatment, and articulated no work restrictions based on Moten's impairments. During his most recent visit with Moten, Dr. Ortolani stated that "[a]s long as [Moten] takes the Doxepin, Naprosyn, and an occasionally Lortab for pain, he seems to do reasonably well." R. 177. Dr. Ortolani also stated that he saw "no reason to continue to see [Moten]." *Id.* Even assuming Dr. Ortolani's statement was an opinion about Moten's ability to work, is was inconsistent with the remainder of Dr. Ortoloni's treatment notes.

Although the ALJ did not specifically reject Dr. Ortolani's single statement that Moten was "still relatively disabled," the ALJ considered Dr. Ortolani's treatment notes and findings. The ALJ completed a thorough summary of the medical evidence, including Dr. Ortolani's records. R. 16. The ALJ then assigned "great weight" to the opinions of the non-examining state agency physicians, and rejected the opinions in Dr. Mixco's Medical Source Statement. Substantial evidence supports the ALJ's evaluation of the evidence, RFC finding, and conclusion that Moten was not disabled. The Commissioner is correct that Dr. Ortolani's "one-time statement" does not warrant remand.

3.   The ALJ's Evaluation of Moten's Pain Testimony

Finally, Moten claims that the Commissioner erred in by improperly discrediting Moten's testimony on his subjective complaints, namely, his pain. Docket No. 10 at 8 - 9. Moten argues that

objective evidence supports Moten's neuropathy, and that the ALJ improperly discredited the testimony because Moten was looking for work and was not receiving on-going treatment.  *Id.*  Moten points to his testimony that he had no money to pay for continued treatment, and that failure to follow prescribed treatment because of insufficient funds does not justify a conclusion that Moten is not disabled.  *Id.* at 9.  The Commissioner argues that the evidence of record fails to support Moten's subjective complaints, and that the ALJ properly discredited Moten's testimony.  Docket No. 12-1 at 9.  The Commissioner further notes that Moten failed to demonstrate that he had the financial inability to pay for treatment, despite his statements during the hearing.  *Id.* at 9 - 10.

As discussed earlier, substantial evidence supports the ALJ's RFC finding.  In his testimony, Moten stated that he could drive, do his own laundry, lift forty to fifty pounds, dress and bathe himself, and fish.  R. 216, 222 - 25.  Moten did testify that he had trouble paying for doctors' visits.  R. 214.  However, there is no indication that Moten required more treatment, other than taking his prescribed medications.  In the treatment notes, including those of Dr. Ortolani dated after the ALJ hearing, Moten's treating physicians never state that Moten requires more treatment than he can afford.

In addition, the ALJ stated numerous reasons for finding Moten's testimony "not totally credible."  R. 16, 18, Finding 5.  In her decision, following a review of the medical evidence and Moten's testimony, the ALJ summarized the Eleventh Circuit's three-part "pain standard," and specified that she considered:

> the nature, location, onset, duration, frequency, radiation, and intensity of any symptom, including pain; the precipitating and aggravating factors; the type, dosage, effectiveness, and adverse side effects of any medication; the treatment, other than medication, for relief of pain or other symptoms [Moten] has undergone; the alleged functional restrictions; and [Moten's] daily activities.

-28-

R. 16.  The ALJ then noted that the EMG and nerve conduction studies showed mild neuropathy; that Dr. Mixco described Moten's peripheral neuropathy as "not clinically significant"; and that Dr. Ortolani stated that Moten was "doing well on medication."  *Id.*  The ALJ next stated her finding on Moten's RFC "[b]ased on the evidence of record, including [Moten's] subjective complaints."  R. 17. Thus, Moten is wrong as to what the ALJ considered in making her credibility finding.  In fact, the ALJ *did* consider Moten's subjective complaints in making her decision.  The ALJ articulated specific and adequate reasons for finding Moten's complaints "not totally credible," and remand is unnecessary.

## VI.   **CONCLUSION**

For the reasons stated above, the decision of the Commissioner should be **AFFIRMED**, and the Clerk should be directed to close the case.

Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within ten days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.  Any party appealing this decision shall file and serve a copy of the oral argument transcript within thirty days of this order.

**DONE AND ORDERED** this 22nd day of November, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

-29-

The Honorable John Antoon, II
United States District Judge

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia          30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL              33602

The Honorable Philemina M. Jones
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL              32817